# EXHIBIT P

```
 1     IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
 2                  CIVIL COURT DEPARTMENT
 3
 4
 5   In the Matter of the Marriage of
 6   LINDA MONSLOW and            Case No. 92 C 1118
 7   H. VINCENT MONSLOW
 8
 9
10
11
12
13
14
15
16          DEPOSITION OF H. VINCENT MONSLOW, the
17   Respondent, taken on behalf of the Petitioner
18   before Barbara L. Brueggemann, CSR, pursuant to
19   Notice on the 7th day of May, 2007, at the
20   offices of Clyde & Wood, LLC, 11600 College
21   Boulevard, Suite 201, Overland Park, Kansas.
22
23
24
25
```

EXHIBIT A

Page 22

1   Q.  How do you spell that last name?
2   A.  I think it's F-A-R-R-E-L-L-Y.
3   Q.  Is that a male person?
4   A.  Yes.
5   Q.  G-E-N-E is the first --
6   A.  I would assume. I believe so.
7   Q.  Anyone else with whom you've dealt?
8   A.  Their lawyers.
9   Q.  All right. Who are their lawyers?
10  A.  There was a firm of Withrow,
11  W-I-T-H-R-O-W, & Terranova, and I believe they
12  were out of the Carolinas also, and a gentleman
13  named Jack -- I think it was Jack Vynalek,
14  V-Y-N-A-L-E-K, something like that. He was a
15  patent lawyer.
16  Q.  He's with this firm of Withrow &
17  Terranova?
18  A.  Yes. Also, a firm named Pepper &
19  Martin. I forgot where they're from, but
20  they're a bigger group I think.
21  Q.  Pepper & Martin? That raises my
22  eyebrows because Blackwell Sanders merged with
23  Peper Martin.
24  A.  You're right. I might have it wrong.
25  It's Pepper, Hamilton maybe. Pepper, Hamilton.

Page 23

1   I'm sorry. I think it's something like that.
2   Q.  Also out of North Carolina or do you
3   know?
4   A.  I don't think so. I think they're out
5   of New York.
6   Q.  Are they an IP firm?
7   A.  At least they have an IP group.
8   Q.  Did you have legal representation
9   regarding the auction and sale of the patents?
10  A.  To an extent.
11  Q.  Other than yourself or any other lawyer
12  who may have actually held an interest in the
13  patent, did you have any representation?
14  A.  We had no outside interest; however,
15  every member of the group in that first tier
16  group is a lawyer. And then Steve Dicky who is
17  deceased. His wife is a lawyer and then her
18  daughter is a lawyer at Blackwell Sanders, IP
19  lawyer.
20  Q.  All right. Well, since we've gotten to
21  this issue, who -- let me give you my
22  understanding. I'm trying to make this go
23  efficiently. It may not seem it at times, but I
24  really am. I understand that on or about the
25  date of your divorce from Linda Monslow, the

Page 24

1   ownership in the patent was held with a 52
2   percent in your hands, 18 percent in your
3   father's, 15 percent in Mr. Armitus -- is that
4   how you say it?
5   A.  Armitus.
6   Q.  And then 15 percent in Mr. Dickey, I
7   believe, at that time; would that be right?
8   A.  I thought that my dad had 20 percent,
9   but maybe it was 18 or is 18. I don't know. I
10  haven't been back to look at documents for a
11  while.
12  Q.  I'm not trying to hide the ball. I
13  think that's what you testified to. That's why
14  I'm saying that.
15  A.  If I testified to it, I'm sure I knew
16  at the time I testified.
17  Q.  I only set that up so I can understand
18  how, if at all, did the ownership then change
19  between the date of the divorce or the day you
20  gave that testimony and the date of the sale of
21  the patent?
22  A.  It didn't.
23  Q.  Okay. So even as of the date of the
24  sale, your father still held, if I'm correct in
25  my recollection of the testimony, 18 percent?

Page 25

1   A.  Eighteen percent what? That's the
2   critical question. Eighteen percent what?
3   Q.  All right. Well, I understand there's
4   an oral partnership that owned the patents; is
5   that correct?
6   A.  There was an oral partnership of those
7   in the first tier that owned the patents, which
8   is the Dickey, the Monslow, and the Armitus.
9   Q.  When you say Monslow, are you including
10  you and your father?
11  A.  No. I'm including me.
12  Q.  Okay. What is that first tier as you
13  call it?
14  A.  Those are the people that ultimately
15  had to step up to the plate and make
16  representations and warranties as owner of the
17  patent or those with direct ownership interests
18  in the patent or to get the sale accomplished.
19  Q.  Okay. So as first tier, what you mean
20  the patents were owned by those three people in
21  oral partnership?
22  A.  Right. Well, Steve Dickey actually had
23  a written agreement. Brett Armitus had a verbal
24  agreement.
25  Q.  All right. Mr. Dickey and Mr. Armitus

Page 26

1  were IP lawyers; is that right?
2     A.  No.
3     Q.  No. How did they acquire their
4  interests in the patent?
5     A.  Mr. Dickey acquired his IP interest by
6  way of an agreement with me that he would have a
7  15 percent interest in it.
8     Q.  What did he do to earn or what
9  consideration did he provide for that 15 percent
10 interest?
11    A.  Lawyer work related to the patent.
12    Q.  And similarly, that's how Mr. Armitus
13 achieved his -- or the consideration he provided
14 for his 15 percent interest?
15    A.  No.
16    Q.  What was the consideration?
17    A.  He helped pay some of the expenses
18 related to the patent.
19    Q.  Okay. So you said the patents were
20 first owned by -- or the first tier of ownership
21 was this oral partnership between Mr. Dickey,
22 Mr. Armitus, and yourself?
23    A.  Right.
24    Q.  And that was with you then owning 70
25 percent, Mr. Dickey owning 15 percent, and Mr.

Page 27

1  Armitus owning 15 percent; is that correct?
2     A.  Right.
3     Q.  So I'm assuming from the way you've
4  answered this question and what you've been
5  saying so far is that there was a second tier
6  above that?
7     A.  Right.
8     Q.  And what was that second tier?
9     A.  The second tier would be, as I
10 testified, that my father gained an interest in
11 it through an investment also and that would be
12 out of my proceeds. He would get a percentage
13 of my proceeds due to investment also.
14    Q.  And what did your father do to -- what
15 consideration did he provide to get this right
16 or entitlement?
17    A.  He paid certain monies for, as I
18 recall, either maintenance fees or filings for
19 the EPO. It's European Treaty Organization,
20 filing European patent aps.
21    Q.  Just to be clear, there are two patents
22 identified by two separate numbers; is that
23 right? How many patents are there?
24    A.  Thank you. There are two patents,
25 United States patents. There are the -- and I

Page 28

1  don't remember the numbers, but --
2     Q.  They're the numbers reflected in the
3  Ocean Tomo auction materials, correct?
4     A.  Those had to have been accurate, yes,
5  but those are two US patents. There were
6  foreign counterparts filed.
7     Q.  And what's happened to those, if
8  anything?
9     A.  I don't know how to answer that
10 question, what's happened with them. I don't
11 know what you mean.
12    Q.  Do you still own them?
13    A.  No.
14    Q.  Do you own any part of them?
15    A.  No.
16    Q.  Have they been sold?
17    A.  Yes.
18    Q.  Who sold them?
19    A.  We did.
20    Q.  Okay. And were those owned in the same
21 roughly ownership structure or percentages as
22 the United States patents at which we've been
23 discussing?
24    A.  We considered those the same. Let me
25 help you out here.

Page 29

1     Q.  Sure.
2     A.  They expired because we didn't keep
3  paying the maintenance fees on them because
4  they're hefty maintenance fees. As I recall --
5  don't hold me to it. Told Ocean Tomo not to
6  hold me to it -- there was one in Australia, one
7  in Canada, and one in the EPO, which would have
8  been Europe, generally, maybe Japan. They
9  expired. During the auction process, Ocean Tomo
10 approached me and mentioned that some of the
11 buyers had noted some foreign counterparts that
12 had been filed and wanted us to -- they wondered
13 or I assumed, I guess, that we had intended to
14 sell those to, to which I told Ocean Tomo that
15 we didn't list them because they're expired.
16 It's our belief they're expired. Nevertheless,
17 Ocean Tomo said that some of the perspective
18 buyers wanted them listed as part of the sale,
19 whether they had expired or not, because they
20 might deem or they maybe deemed that there might
21 be some rights flowing from owning them anyway,
22 at which time Ocean Tomo provided me a list of
23 what the foreign counterparts had been and we
24 basically signed off saying whatever we might
25 have there -- in quick claim type of language,